# Exhibit A

1

2

3

4

5

6        **SUPERIOR COURT OF WASHINGTON FOR KING COUNTY**

7

8    **SHIRLEY COX, Individually and as**          NO.
     **Personal Representative of the**
9    **Estate of JON COX, Deceased,**              COMPLAINT FOR PERSONAL
                                                    INJURIES AND WRONGFUL DEATH
10           **Plaintiff,**

11   **v.**

12   **B&R AERIAL CROP CARE, INC.;**
     **CHEVRON U.S.A., INC.;**
13   **NORTHWEST WHOLESALE, INC.;**
     **SYNGENTA CROP PROTECTION,**
14   **LLC; and THE MCGREGOR**
     **COMPANY,**
15
             **Defendants.**
16

17           COMES NOW Plaintiff, Shirley Cox, individually and as Personal Representative of the

18   Estate of Jon Cox ("JON COX" or "DECEDENT"), by and through his undersigned attorneys, and

19   files this, Plaintiff's Complaint for Personal Injuries and Wrongful Death against Defendants B&R

20   AERIAL CROP CARE, INC; CHEVRON U.S.A., INC.; THE MCGREGOR COMPANY;

21   NORTHWEST WHOLESALE, INC.; and SYNGENTA CROP PROTECTION, LLC and alleges

22   the following:

23           1.      Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been

---

[1]      Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

COMPLAINT FOR PERSONAL INJURIES AND          **WEINSTEIN CAGGIANO PLLC**
WRONGFUL DEATH - 1                                   600 UNIVERSITY STREET, SUITE 1620
                                                     SEATTLE, WASHINGTON  98101
                                             (206) 508-7070  -  FACSIMILE (206) 237-8650

developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("paraquat") developed, registered, formulated, distributed, and sold for use in the United States, including the State of Washington.

2.    Defendants are companies and successors-in-interest to companies that since 1964 have manufactured, distributed, and sold paraquat for use in Washington, acted in concert with others who manufactured, distributed, and sold paraquat for use in Washington, or sold and used paraquat in Washington.

3.    Plaintiff brings this suit against Defendants to recover damages for personal injuries and wrongful death resulting from DECEDENT'S exposure to paraquat over many years.

## I.    PARTIES

4.    Plaintiff Shirley Cox is the surviving spouse of decedent, JON COX. Plaintiff Shirley Cox was appointed Personal Representative of the Estate of JON COX on January 2, 2024. JON COX died as a result of his Parkinson's Disease on November 24, 2023.  Plaintiff Shirley Cox resides in Hay, Washington.

5.    Defendants and/or their predecessors-in-interest are corporations who, at all times relevant herein, manufactured, sold, supplied, specified, required, utilized, and/or distributed paraquat[2] and/or paraquat-containing products.

6.    Defendant B&R Aerial Crop Care, Inc. ("B&R") is a Washington company.  It is a company who, at times relevant herein, sold, supplied, and/or distributed defective and unreasonably dangerous paraquat products in Washington, where DECEDENT worked with and/or around said products.  Defendant B&R may be served through its registered agent, Chris A. Eskildsen, at 409 Airport Lane, Connell, Washington, 99326-0667.

7.    Defendant Chevron U.S.A., Inc., ("Chevron USA") is a foreign profit company with its principal place of business located in San Ramon, California.  It and/or its predecessor-in-interest is a company who, at times relevant herein, sold, supplied, and/or distributed defective and

[2]    Unless the context indicates otherwise, references in this complaint to "paraquat" include the chemical compound paraquat dichloride and formulated herbicide products containing paraquat dichloride as an active ingredient.

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 2

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

unreasonably dangerous paraquat products in Washington, where DECEDENT worked with and/or around said products. Defendant Chevron USA may be served with process through its registered agent, The Prentice-Hall Corporation System, Inc., 300 Deschutes Way SW, Ste 208, Mc-CSC1, Tumwater, Washington, 98501.

8. Northwest Wholesale Incorporated ("Northwest Wholesale") is a Washington company. It is a company who, at times relevant herein, sold, supplied, and/or distributed defective and unreasonably dangerous paraquat products in Washington, where DECEDENT worked with and/or around said products. Defendant Chamberlin Agriculture may be served through its registered agent, Rodney Van Orman, 5416 Enterprise Dr., East Wenatchee, Washington 98802.

9. Syngenta Crop Protection, LLC ("SCPLLC") is a foreign profit company with its principal place of business located in Greensboro, North Carolina. It and/or its predecessor-in-interest is a company who, at times relevant herein, sold, supplied, and/or distributed defective and unreasonably dangerous paraquat products in Washington, where DECEDENT worked with and/or around said products. Defendant Syngenta Crop Protection, LLC may be served with process through its registered agent, C T Corporation System, 711 Capitol Way S, Ste. 204, Olympia, Washington, 98501.

10. Defendant THE MCGREGOR COMPANY ("MCGREGOR") is a Washington company. It is a company who, at times relevant herein, sold, supplied, and/or distributed defective and unreasonably dangerous paraquat products in Washington, where DECEDENT worked with and/or around said products. Defendant MCGREGOR may be served through its corporate office and President, Ian McGregor, or Chairman, Alex McGregor, located at 401 Airport Rd, Colfax, Washington, 99111.

## II.    PERSONAL JURISDICTION & VENUE

11. DECEDENT was exposed to paraquat-containing products in the State of Washington as a result of specific tortious actions undertaken by Defendants. Defendants are corporations or other business entities organized under the laws of the various states of the United States, including the State of Washington, that were and/or are doing business in the State of

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 3

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

Washington and/or were participating in a concert-of-action that was or is located or conducted in or through Washington and/or had effects in Washington, including, but not limited to, the violation within the state of its laws and regulations.

12. The Court has general jurisdiction over Defendants B&R, MCGREGOR, and Northwest Wholesale because they are incorporated in Washington and have their principal places of business in Washington.

13. The Court has specific jurisdiction over the remaining Defendants because they each (1) purposefully performed acts or consummated transactions in Washington, including business directly related to Plaintiff's allegations herein; (2) Plaintiff's cause of action arises out of and/or relates to Defendants' activities and/or transactions in Washington; and/or Defendants committed a tortious act that caused or contributed to DECEDENT's exposure to paraquat in Washington; (3) said activities or transactions were directed in whole or in part toward the state; and (4) assumption of jurisdiction over such out-of-state defendants by this Court does not offend traditional notions of fair play and substantial justice.

14. Furthermore, each Defendant: (A) (1) regularly does or solicits (and/or during the relevant time period, did or solicited) business; (2) engages (and/or during the relevant time period engaged) in one or more other persistent courses of conduct, including conduct related to Plaintiff's allegations herein; and/or (3) derives (and/or during the relevant time period derived) substantial revenue from goods used or consumed or services rendered in the state, including from products and/or services at issue herein; and/or (B) expected or should reasonably have expected (and/or during the relevant time period expected or should have reasonably expected) its acts to have consequence in Washington and derives (and/or during the relevant time period derived) substantial revenue from interstate or international commerce.

15. Venue is appropriate in King County pursuant to RCW 4.12.020 and 4.12.025 because certain Defendants reside in King County, Washington; currently transact business in King County; and/or transacted business at the time the cause of action arose in King County. For example, Defendants Chevron USA currently owns and/or operate dozens of filling stations in

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 4

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

King County.

### III.     FACTS

**A.     Defendants and Their Corporate Predecessors**

 **1.     Syngenta Entity**

 16. In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI"). In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively, "ICI Americas"). In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd. In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

 17. As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC. Before ICI's demerger and creation of the Zeneca Group, ICI had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

 18. As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory. After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.  As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

19.    In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.  As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into, or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

20.    In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.  In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Syngenta AG ("SAG") as the ultimate parent company.

21.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG; and Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.  Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

22.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware. In 2010, SCPI was converted into Defendant SCPLLC, a wholly owned subsidiary of SAG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

23.    As a result of these various transactions, discussed *supra*:

- SAG is a successor by merger or continuation of business to its corporate predecessor Novartis AG;

- SAG is a successor by merger or continuation of business to its corporate predecessor AstraZeneca PLC;

- SAG is a successor by merger or continuation of business to its corporate predecessor Zeneca Group PLC;

- SAG is a successor by merger or continuation of business to its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.;

- SAG is a successor by merger or continuation of business to its corporate predecessor ICI Bioscience Ltd.; and

- SAG is a successor by merger or continuation of business to its corporate predecessor Plant Protection Ltd.

24.    Additionally, as a result of these various transactions, discussed *supra*:

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor SCPI;

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor NCPI;

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor Ciba-Geigy Corporation;

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor Zeneca Inc.; and

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

25.    SCPLLC is registered to do business in the State of Washington, and SCPLLC does substantial business in the State of Washington, including the following:

a.   markets, advertises, distributes, sells, and delivers paraquat and other pesticides to distributors, dealers, applicators, and farmers in the State of Washington;

b.   secures and maintains the registration of paraquat and other pesticides with the EPA and the Washington Department of Agriculture to enable itself and others to manufacture, distribute, sell, and use these products in the State of Washington; and

c.   performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the State of Washington.

26.    SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.  SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.  SAG is a management holding company.

27.    Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries. SCPAG employs the global operational managers of production, distribution, and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions.  The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines.  The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

28.    SCPAG directly and wholly owns Syngenta International AG ("SIAG").  SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.  SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.  SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources,

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance. Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

29.    SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

      a.    SAG directly and wholly owns Syngenta Participations AG;

      b.    Syngenta Participations AG directly and wholly owns Seeds JV C.V.;

      c.    Seeds JV C.V. directly and wholly owns Syngenta Corporation;

      d.    Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC; and

      e.    Syngenta Seeds, LLC directly and wholly owns SCPLLC.

30.    Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.  SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

31.    SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.  Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management'' system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

32.    The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.  SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.  SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.  The SEC consists of the CEO and various

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

global Heads, which currently are:

      a.  The Chief Executive Officer;

      b.  Group General Counsel;

      c.  The President of Global Crop Protection;

      d.  The Chief Financial Officer;

      e.  The President of Global Seeds; and

      f.  The Head of Human Resources;

33.      SIAG employs all of the members of the Executive Committee.

34.      Global Syngenta Group corporate policies require SAG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams. SAG's board of directors meets five to six times a year. In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

35.      Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members. Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers. Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers. Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

36.      The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries. Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 10

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

functions), which includes the President of Global Crop Protection, the CP region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.  The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

37.     Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Croup's U.S. and Canadian CP business (and, when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).  The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

38.     The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.  Some members of the North America Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.  Syngenta Group global Heads that supervise SCPLLC employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

39.     The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.  SCPLLC performs its functions according to its role in the CP Division structure:

    a.     CP Division development projects are proposed at the global level, ranked, and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

b. New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

c. These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

d. Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

e. Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f. If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g. Decisions to sell the product must be approved by the SEC; and

h. The products that are sold all bear the same Syngenta trademark and logo.

40.     SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.  These "reserved powers" require Syngenta Croup companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.  For example, although SAG permits Syngenta Croup companies to handle small legal matters on their own, under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

41.     Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner. Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

42.     Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities

that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.  SAG and the global management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas including:

      a.  Product development;

      b.  Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of paraquat and other pesticides);

      c.  Production;

      d.  Marketing;

      e.  Sales;

      f.  Human resources;

      g.  Communications and public affairs;

      h.  Corporate structure and ownership

      i.  Asset sales and acquisitions

      j.  Key appointments to boards, committees, and management positions;

      k.  Compensation packages;

      l.  Training for high-level positions; and

      m.  Finance (including day-to-day cash management) and tax.

43.    Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.  Under this international assignment program, at the instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 13

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

44.     The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.  The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.  Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.  The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.  Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.  SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

45.     In 2011, a federal District Court held that SAG's unusually high degree of control over SCPLLC made SCPLLC the agent or alter ego of SAG and therefore subjected SAG to jurisdiction in the State of Illinois. *See City of Greenville, Ill. v. Syngenta Crop Protection, Inc.*, 830 F. Supp. 2d 550 (S.D. Ill. 2011).  SAG continues to exercise the unusually high degree of control over SCPLLC.  SAG, through its agent or alter ego, SCPLLC, does substantial business in the State of Washington, in the ways previously alleged as to SCPLLC.

**2.    Chevron Entity**

46.     Chevron Chemical Company ("Chevron Chemical") was a corporation organized in 1928 under the laws of the State of Delaware.  In 1997, Chevron Chemical was merged into Chevron Chemical Company LLC ("Chevron Chemical LLC"), a limited liability company organized under the laws of the State of Delaware.  In the mid-2000s, Chevron Chemical LLC was merged into or continued to operate under the same or similar ownership and management as CP Chemical, a limited partnership organized and existing under the laws of the State of Delaware

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

with its principal place of business in The Woodlands, Texas.

47.     As a result of these various transactions, discussed *supra*: CP Chemical is a successor by merger or continuation of business to its corporate predecessor Chevron Chemical LLC; and CP Chemical is a successor by merger or continuation of business to its corporate predecessor Chevron Chemical.

48.     CP Chemical is registered to do business in the State of Washington, and does substantial business in the State of Washington, including King County; among other things, it owns and/or operates numerous filling stations in King County.

49.     Defendant Chevron USA is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in the State of California.  Chevron USA is registered to do business in Washington.  In the mid-2000s, Chevron USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical and Chevron Chemical LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of paraquat products in the United States as alleged in this Complaint.

**3.     B&R Aerial Crop Care, Inc.**

50.     Defendant B&R is a Washington company.  During the relevant time period, B&R was located at 409 Airport Lane, Connell, Washington 99326, where it sold and/or mixed, *inter alia*, paraquat-containing herbicides.

**4.     The McGregor Company**

51.     Defendant MCGREGOR is a Washington company.   During the relevant time period, MCGREGOR was located at 401 Airport Road, PO Box 740 Colfax, Washington 99111 and maintained numerous retail stores in Washington where it sold and/or mixed, *inter alia*, paraquat-containing herbicides.

**5.     Northwest Wholesale**

52.     Defendant Northwest Wholesale is a Washington company.  Defendant Northwest Wholesale is a Washington company.  During the relevant time period, Northwest Wholesale

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 15

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

maintained a retail location in various locations in Washington, where it sold and/or mixed, *inter alia*, paraquat-containing herbicides.

**B.    Paraquat Manufacture, Distribution, and Sale**

53.    ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of paraquat in 1955.  The leading manufacturer of paraquat is Syngenta, which (as ICI) developed the active ingredient in paraquat in the early 1960s.

54.    ICI produced the first commercial paraquat formulation and registered it in England in 1962.  Paraquat was first marketed in 1962 under the brand name Gramoxone.  Paraquat first became commercially available for use in the United States in 1964.

55.    In or about 1964, ICI and Chevron Chemical entered into agreements regarding the licensing and distribution of paraquat ("the ICI-Chevron Chemical Agreements").  In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI.  The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect until about 1986.

56.    In the ICI-Chevron Chemical Agreements:

- ICI and ICI Americas granted Chevron Chemical a license to their patents and technical information to permit Chevron Chemical to formulate or have formulated, use, and sell paraquat in the United States and to grant sub-licenses to others to do so;

- Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas to formulate or have formulated, use, and sell paraquat throughout the world and to grant sub-licenses to others to do so;

- ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding paraquat;

- ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell paraquat in the United States; and

- ICI and ICI Americas granted Chevron Chemical a license to distribute and sell paraquat in the U.S. under the ICI-trademarked brand name Gramoxone.

57.    ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 16

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070 -  FACSIMILE (206) 237-8650

Chemical Agreements to divide the worldwide market for paraquat between them. Under the ICI-Chevron Chemical Agreements and related agreements:

- Chevron Chemical distributed and sold paraquat in the U.S. and ICI and ICI Americas distributed and sold paraquat outside the United States.

- Both ICI and ICI Americas and Chevron Chemical distributed and sold paraquat under the ICI-trademarked brand name Gramoxone.

- ICI and ICI Americas and Chevron Chemical exchanged patent and technical information regarding paraquat.

- ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States.

- ICI and ICI Americas manufactured and sold paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in Washington, where Chevron Chemical registered paraquat products and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

- Chevron Chemical distributed and sold paraquat in the United States under the ICI-trademarked brand name Gramoxone and other names, including in Washington, where Chevron Chemical registered such products and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

58.    SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Washington, where they registered such products, and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

59.    SAG and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

States from approximately 1964 through the present.

60.    SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Washington, where they registered such products, and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

61.    SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

62.    Chevron Chemical manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in Washington, where Chevron Chemical registered such products, and used in Washington, and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

C.    **Paraquat Usage**

63.    Since 1964, paraquat has been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops; to control weeds in orchards; and to desiccate (dry) plants before harvest.  At all relevant times, where paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable.

64.    At all relevant times, paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, was typically sold to end-users in the form of liquid concentrates (and less

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

65.     At all relevant times, concentrates containing paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

66.     At all relevant times, paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was as intended or directed or was reasonably foreseeable.

**D.     Paraquat Exposure**

67.     At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

68.     At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

69.     At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared.

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

70.     At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

71.     At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

72.     At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

73.     At all relevant times, it was reasonably foreseeable that paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

74.     At all relevant times, it was reasonably foreseeable that paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

75.     At all relevant times, it was reasonably foreseeable that paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

76.     At all relevant times, it was reasonably foreseeable that paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

**E.     Parkinson's Disease**

77.     PD is progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.  Scientists who study PD generally agree that fewer than 10% of all PD cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

### 1.    Symptoms and treatment

78.    The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).  PD's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

79.    Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of PD, often for years before any of the primary motor symptoms appear.

80.    There is currently no cure for PD.  No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

### 2.    Pathophysiology

83.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.  Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).  The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

81.    Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.  The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of PD.  Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

oxidants present in cells and cells' antioxidant defenses.  Scientists who study PD generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

**F.     Paraquat's Toxicity**

82.     Paraquat is highly toxic to both plants and animals.  Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.  Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.  Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

83.     The redox cycling of paraquat in living cells interferes with cellular functions that are necessary to sustain life—photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.  The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.  Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical.  Significantly, Paraquat's redox properties have been known to the manufacturers and sellers of Paraquat since at least the 1930s, but this information was not disclosed to the general public nor end-users.

84.     That paraquat is toxic to the cells of plants and animals because it creates oxidative stress through redox cycling has been known since at least the 1960s, but this information was not disclosed to the general public nor end-users.  The surfactants with which the concentrates containing paraquat manufactured, distributed, and sold by Defendants,  Defendants' corporate

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 22

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  ‑  FACSIMILE (206) 237-8650

predecessors, and others with whom they acted in concert typically were formulated were likely to increase paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

**G.    Paraquat and Parkinson's Disease**

85.    Defendants knew or should have known that the same redox properties that make paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons, causing PD.  Defendants did not disclose this information to the general public nor end-users.

**H.    Paraquat Regulation**

86.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).  As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

87.    As a general rule, FIFRA requires registrants to perform health and safety testing of pesticides. FIFRA does not, however, require the EPA to perform health and safety testing of pesticides itself, and the EPA generally does not perform such testing.

88.    The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

    a.    its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

    b.    its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

    c.    it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

> d. when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

89.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).  However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

90.     The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person . . . any pesticide which is . . . misbranded." 7 U.S.C. § 136j(a)(1)(E).  A pesticide is misbranded under FIFRA if, among other things:

> a. its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);
>
> b. the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or
>
> c. the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(l)(G).

91.     Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

engaged in any unfair or deceptive practice regarding paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA; however, Plaintiff brings claims and seeks relief in this action only under state law, and do not bring any claims or seek any relief in this action under FIFRA.

I.      **Jon Cox's Paraquat Exposure**

92.     DECEDENT (DOB: 2/7/1945; SSN: ####-##-5444) was exposed to Paraquat and/or paraquat-containing products, which had been manufactured, supplied, produced, mixed and/or placed into the stream of commerce by Defendants.

93.     More specifically, beginning in or around the late 1960s, DECEDENT was exposed to paraquat and/or paraquat-containing products while working on his family's cattle ranch in or around Hay, Washington.  DECEDENT worked at this ranch beginning in the 1960s and all the way until the mid to late 2010s.  He owned and operated the ranch beginning in or around 2000. DECEDENT lived on this farm for decades and then his widow, Shirley Cox, lived on this far beginning around 1990.  Decedent married Shirley Cox in or around 1990 and dated her beginning in or around 1985.

94.     Beginning in or around the late 1960s and continuing up through approximately the mid-2010s, DECEDENT used paraquat.  The paraquat was utilized via crop dusting, tractor spraying and handheld spraying.  For crop dusting, DECEDENT owned his own airplane for which he loaded and mixed paraquat into said airplane and applied the material to his fields.  For tractor spraying, DECEDENT loaded and mixed paraquat and used a sprayer hitched to an open-cab tractor to spray paraquat and/or paraquat-containing products.    For handheld spraying, DECEDENT loaded and mixed paraquat into a handheld or backpack sprayer and applied the material. This paraquat and/or paraquat-containing product was purchased at various locations including B&R, MCGREGOR, and Northwest Wholesale and was designed, manufactured, distributed and/or sold by Chevron U.S.A, CP Chemical, Syngenta and/or Syngenta AG.  The containers of paraquat and/or paraquat-containing product were labeled with the words "Paraquat"

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  –  FACSIMILE (206) 237-8650

and/or "Gramoxone," among other names.

As part of this work, DECEDENT mixed paraquat and/paraquat containing concentrates. Plaintiff recalls observing DECEDENT perform this work. As part of the spraying process, DECEDENT would sometimes have to re-enter already sprayed fields to spray additional paraquat. DECEDENT would often have to clean and unclog spray nozzles used to spray the paraquat and/or paraquat-containing product. During the spraying and mixing process, DECEDENT'S skin was exposed to paraquat and/or paraquat-containing product. DECEDENT also breathed in paraquat and/or paraquat-containing product while spraying it.

95.    As a direct and proximate result of these exposures, DECEDENT developed Parkinson's disease ("PD"), which he was diagnosed with on or about 2006. He suffered with PD for roughly 17 years until he died in November of 2023.

96.    At no time when using paraquat himself was DECEDENT aware that exposure to paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

97.    The paraquat to which DECEDENT was exposed was sold and used in Washington, and was manufactured, distributed, and, on information and belief, sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in Washington.

98.    On information and belief, DECEDENT was exposed to paraquat:

- manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of his exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert;

- that was sold and used in Washington, and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending, or expecting that it would be sold and used in Washington;

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 – FACSIMILE (206) 237-8650

- that was sold and used in Washington, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending, or expecting that it would be sold and used in Washington;

- that was sold and used in Washington, and was manufactured, distributed, and sold by Chevron Chemical, acting in concert with ICI and ICI Americas, intending or expecting that it would be sold and used in Washington; and

- that was sold and used in Washington and was distributed and sold by B&R, MCGREGOR, and Northwest Wholesale.

## CLAIMS OF LIABILITY

99.    Plaintiff claims liability against Defendants based upon the theories of common law negligence; strict product liability, negligence, and breach of express and implied warranties under the Washington Product Liability Act (WPLA), RCW 7.72 *et seq*.; strict product liability under Section 402A and 402B of the Restatement of Torts; conspiracy; wrongful death; and any other applicable theory of liability.  The liability-creating conduct of Defendants consisted of negligent and unsafe design; failure to inspect, test, warn, instruct, monitor, and/or recall; failure to substitute safe products; marketing or installing unreasonably dangerous or extra-hazardous and/or defective products; marketing or installing products not reasonably safe as designed; and marketing or installing products not reasonably safe for lack of adequate warning and marketing or installing products with misrepresentations of product safety.

## COUNT ONE: NEGLIGENCE

### (Against All Defendants)

100.    Plaintiff repeats and realleges paragraphs 1-99 as though fully set forth herein.

101.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling herbicides, and designed, manufactured, distributed, and sold paraquat.

102.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed was used in the intended and directed manner or a reasonably

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 27

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

foreseeable manner.

103.    At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling paraquat, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including DECEDENT.

104.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the paraquat to which DECEDENT was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

105.    In breach of the aforementioned duty to DECEDENT, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently:

a.    failed to design, manufacture, formulate, and package paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.    designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  –  FACSIMILE (206) 237-8650

neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

c.   failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.   failed to perform adequate testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.   failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.   failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

g.   failed to direct that paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.   failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 29

106.    As a direct and proximate result of the negligence of Defendants, their corporate predecessors, and others with whom they acted in concert, DECEDENT developed PD; suffered severe and permanent physical pain, mental anguish, and disability; suffered the loss of a normal life; lost income that he otherwise would have earned; incurred reasonable expenses for necessary medical treatment; and died.

107.    As a direct and proximate result of the negligence of Defendants, their corporate predecessors, and others with whom they acted in concert, Plaintiff suffered and continues to suffer emotional pain and suffering, loss of society and companionship, and economic losses.

## COUNT TWO: STRICT PRODUCT LIABILITY – DESIGN DEFECT
### (Against Defendants Chevron USA and SCPLLC)

108.    Plaintiff repeats and realleges paragraphs 1-107 as though fully set forth herein.

109.    At all relevant times, Defendants, Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert were engaged in the U.S. paraquat business.

110.    At all relevant times, Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat.

111.    The paraquat that Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed was in a defective condition that made it unreasonably dangerous, in that when used in the intended and directed manner or a reasonably foreseeable manner:

  a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

  b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

112.    This defective condition existed in the paraquat that Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed when it left the control of Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

115.    As a result of this defective condition, the paraquat that Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.  The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

113.    As a direct and proximate result of the defective condition DECEDENT developed PD; suffered severe and permanent physical pain, mental anguish, and disability; suffered the loss of a normal life; lost income that he otherwise would have earned; incurred reasonable expenses for necessary medical treatment; and died.

114.    As a direct and proximate result of the defective condition, Plaintiff suffered and continues to suffer emotional pain and suffering, loss of society and companionship, and economic losses.

## COUNT THREE: STRICT PRODUCT LIABILITY: FAILURE TO WARN

### (Against Defendants Chevron USA and SCPLLC)

115.    Plaintiff repeats and realleges paragraphs 1-114 as though fully set forth herein.

116.    At all times relevant to this claim, Defendants Chevron USA and SCPLLC, their

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat.

117.    When Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the paraquat to which DECEDENT was exposed, Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

    a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

118.    The paraquat that Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

    a.    it was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.    it was not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

119.    This defective condition existed in the paraquat that Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed when it left the control of Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

120.    As a result of this defective condition, the paraquat that Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

121.    The paraquat that Defendants Chevron USA and SCPLLC their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which DECEDENT was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

122.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by Defendants Chevron USA and SCPLLC, their corporate predecessors, and others with whom they acted in concert, DECEDENT developed PD; suffered severe and permanent physical pain, mental anguish, and disability; suffered the loss of a normal life; lost income that he otherwise would have earned; incurred reasonable expenses for necessary medical treatment; and died.

123.    As a direct and proximate result of the failure to adequately warn, Plaintiff suffered and continues to suffer emotional pain and suffering, loss of society and companionship, and economic losses.

## COUNT FOUR: BREACH EXPRESSED AND IMPLIED WARRANTIES

### (Against All Defendants)

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

124.    Plaintiff repeats and realleges paragraphs 1-123 as though fully set forth herein.

125.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling paraquat and other restricted-use pesticides and themselves out as having knowledge or skill regarding paraquat and other restricted-use pesticides.

126.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold paraquat.

127.    At the time of each sale of paraquat to which DECEDENT was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert expressly and impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used.

128.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of paraquat to which DECEDENT was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

a.  it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.  when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

129.    As a direct and proximate result of the breaches of express and implied warranties by Defendants, their corporate predecessors, and others with whom they acted in concert, DECEDENT developed PD; suffered severe and permanent physical pain, mental anguish, and disability; suffered the loss of a normal life; lost income that he otherwise would have earned;

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070 – FACSIMILE (206) 237-8650

incurred reasonable expenses for necessary medical treatment; and died.

130.    As a direct and proximate result of breaches of express and implied warranties by Defendants, their corporate predecessors, and others with whom they acted in concert,, Plaintiff suffered and continues to suffer emotional pain and suffering, loss of society and companionship, and economic losses.

## COUNT FIVE: WRONGFUL DEATH

### (Against All Defendants)

131.    Plaintiff repeats and realleges paragraphs 1-130 as though fully set forth herein.

132.    As a direct and proximate result of Defendants' negligence, the defective condition of its paraquat products, the failure to warn of the breach of express and implied warranties, DECEDENT was exposed to paraquat, developed Parkinson's Disease and subsequently died.

133.    Prior to DECEDENT's death, he experienced economic damages, including but not limited to health care expenses, lost wages, and out of pocket expenses. Prior to DECEDENT's death, he experienced non-economic damages, such as pain, suffering, anxiety, emotional distress, humiliation, and fear as a result of his diagnosis and the associated PD symptoms in an amount to be proven at trial.

134.    As a proximate result of DECEDENT's death and Defendants' negligence and/or product liability and/or conspiracy and/or other basis of liability, Plaintiff Shirley Cox has suffered loss of spousal relationship as a result of DECEDENT's illness and subsequent death, including a loss of emotional support, love, affection, care, services, companionship, and assistance in an amount to be proven at trial. Plaintiff Shirley Cox has also sustained loss of economic support and services due to Mr. Cox's illness and subsequent death, in an amount to be proven at trial.

135.    As a result of DECEDENT's death, DECEDENT's children, Kathryn Elizabeth Cox and Jason Paul Cox and step-children Michelle Angela Hathaway-Danielson and Melissa Sue Hathaway-Fleming have also sustained a loss of parental-child relationship due to DECEDENT's illness and death, including loss of emotional support, love, affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

## COUNT SIX: LOSS OF CONSORTIUM

### (Against All Defendants)

136.    As a proximate result of Defendants' negligence and/or product liability and/or other basis of liability, Plaintiff Shirley Cox has suffered loss of spousal relationship as a result of Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, companionship, and assistance in an amount to be proven at trial. Plaintiff Shirley Cox has also sustained loss of economic support and services due to DECEDENT Jon Cox's illness and subsequent death, in an amount to be proven at trial.

137.    DECEDENT Jon Cox's children have also sustained a loss of parental–child relationship due to his illness and subsequent death.

138.    Kathryn Elizabeth Cox has sustained a loss of parental–child relationship due to DECEDENT Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

139.    Jason Paul Cox has sustained a loss of parental–child relationship due to DECEDENT Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

140.    Michelle Angela Hathaway-Danielson has sustained a loss of parental–child relationship due to DECEDENT Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

141.    Melissa Sue Hathaway-Fleming has sustained a loss of parental–child relationship due to DECEDENT Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  –  FACSIMILE (206) 237-8650

## V.    REQUESTED RELIEF

142.    Plaintiff repeats and realleges paragraphs 1-141 as though fully set forth herein.

143.    As a proximate result of Defendants' negligence and/or product liability and/or other basis of liability, DECEDENT sustained pain, suffering, and disability in an amount not now known, but which will be proven at trial and death. DECEDENT Jon Cox is entitled to damages for his physical pain and suffering, mental anguish, anxiety, physical impairment, disability, disfigurement, loss of enjoyment of life, and his reasonable and necessary medical bills and other expenses incurred as a result of his Parkinson's disease. DECEDENT also sustained medical expenses, funeral expenses, and economic losses in an amount to be proven at trial. DECEDENT's survival damages are brought under Washington's general and special survival statutes for the injuries incurred by Jon Cox prior to his death. These claims are made in the name of the Personal Representative of the Estate as required by Washington law for the beneficiaries named herein who are enumerated under RCW 4.20.020 as beneficiaries.

144.    As a proximate result of Defendants' negligence and/or product liability and/or other basis of liability, Plaintiff Shirley Cox has suffered loss of spousal relationship as a result of Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, companionship, and assistance in an amount to be proven at trial. Plaintiff Shirley Cox has also sustained loss of economic support and services due to DECEDENT Jon Cox's illness and subsequent death, in an amount to be proven at trial.

145.    DECEDENT Jon Cox's children have also sustained a loss of parental–child relationship due to his illness and subsequent death.

146.    Kathryn Elizabeth Cox has sustained a loss of parental–child relationship due to DECEDENT Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

147.    Jason Paul Cox has sustained a loss of parental–child relationship due to DECEDENT Jon Cox's illness and subsequent death, including a loss of emotional support, love,

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

148.    Michelle Angela Hathaway-Danielson has sustained a loss of parental–child relationship due to DECEDENT Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

149.    Melissa Sue Hathaway-Fleming has sustained a loss of parental–child relationship due to DECEDENT Jon Cox's illness and subsequent death, including a loss of emotional support, love, affection, care, services, society, companionship, consortium, and assistance in an amount to be proven at trial.

150.    DECEDENT sustained medical expenses and economic losses in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

    a.  For all wrongful death and survival damages recoverable by Washington law, including all damages provided for in RCW 4.40.010, 4.20.046 and 4.20.060 and WPI 31.01.01.

    b.  For general and special damages specified above, including pain, suffering, loss of consortium and parental-child relationship, disability and death;

    c.  For medical and related expenses and economic loss, all of which will be proven at the time of trial;

    d.  Past and future loss of care, maintenance, services, support, advice, counsel, and consortium which Plaintiff Shirley Cox would have received from DECEDENT Mr. Cox before his illness, disability, and subsequent death caused by his exposure to paraquat;

    e.  Past and future loss of the parental-child relationship that children Kathryn Elizabeth Cox and Jason Paul Cox and step-children Michelle Angela Hathaway-Danielson and Melissa Sue Hathaway-Fleming would have received from DECEDENT before his illness, disability, and subsequent death caused by his exposure to paraquat;

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  –  FACSIMILE (206) 237-8650

f.   For all other damages that beneficiaries to the Wrongful Death Act are entitled to under Washington law;

g.   Physical pain and suffering in the past that DECEDENT experienced;

h.   Physical impairment and incapacity in the past that DECEDENT experienced;

i.   Pain, suffering and mental anguish in the past that DECEDENT experienced;

j.   Reasonable and necessary medical expenses for treatment received in the past that DECEDENT experienced;

k.   Disfigurement in the past that DECEDENT experienced;

l.   Disability in the past that DECEDENT experienced;

m.   The lost earnings that DECEDENT experienced;

n.   Plaintiff be awarded full, fair, and complete recovery for all claims and causes of action relevant to this action;

o.   Plaintiff be awarded all appropriate costs, fees, expenses, and pre-judgment and post judgment interest pursuant to the laws of the State of Washington as authorized by law on the judgments entered in Plaintiff's behalf;

p.   Other damages contemplated by law in amounts to be determined at trial; and

q.   Such other relief the court deems just and proper.

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON  98101
(206) 508-7070  -  FACSIMILE (206) 237-8650

1   DATED this 22nd day of July, 2024.

2

3                                    WEINSTEIN CAGGIANO PLLC

4

5                                    Brian D. Weinstein, WSBA No. 24497
                                     Alexandra B. Caggiano, WSBA No. 47862
                                     Dylan J. Johnson, WSBA No. 54147
6                                    600 University Street, Suite 1620
                                     Seattle, Washington 98101
7                                    Phone: (206) 508-7070
                                     Fax: (206) 237-8650
8
                                     Counsel for Plaintiff
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

COMPLAINT FOR PERSONAL INJURIES AND
WRONGFUL DEATH - 40